(No. 32379.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ARTHUR GRUNDEIS, Plaintiff in Error.

*Opinion filed September 17, 1952—Rehearing denied Nov. 17, 1952.*

HAROLD W. WYNKOOP, of Chicago, for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and ROBERT C. NELSON, State's Attorney, of Waukegan, (RICHARD R. BAIRSTOW, EUGENE T. DALY, and HARRY L. PATE, of counsel,) for the People.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

Defendant, Arthur Grundeis, was indicted in the circuit court of Lake County for the crime of larceny. The indictment charged him with the theft of property belonging to Anthony M. Hertle, having an aggregate value of $100 and consisting of an iron cart, six bags of cement and ninety-five pieces of lumber of various sizes. A jury found him guilty. Motions for a new trial and in arrest of judgment were overruled, and defendant was sentenced to imprisonment in the penitentiary for a term of not less than two nor more than five years. He prosecutes this writ of error.

On October 22, 1950, defendant, who was engaged in the dry-cleaning business in the village of Deerfield, was in the process of building a house in Delmar Woods, a subdivision just outside the village. He had hired workmen and worked himself in his spare time and on week ends. The foundation of the house was just being laid; stakes had been put in place, the excavation dug out, and apparently some ribbons of concrete had been laid down. Defendant had also accumulated several large piles of lumber on the lot to commence the construction of the framework of the house.

About 9:00 A.M. on October 22, 1950, Captain Lempinen of the Highland Park police received a call from John Orsey that a quantity of building material had been taken from his building site in Highland Park during the previous night, and that a neighbor had seen a red truck, with the name "Deerfield" on its door, in Orsey's driveway at the time. Lempinen immediately drove to Deerfield and talked to Chief McLaughlin of the Deerfield police. They ascertained that Edward Horneberger owned such a red truck, and Horneberger informed them that his brother-in-law, the defendant, had borrowed the truck. Officers Lempinen and McLaughlin then drove to Delmar Woods where they saw a red truck on defendant's building site and defendant removing a stump.

According to Lempinen's testimony, he inquired of defendant if he was the driver of the truck. Upon receiving an affirmative answer, Lempinen laid his hand on the defendant and stated, "You had better not leave. We are checking on the theft of some materials from Highland Park and feel you are the responsible party. You better stay here until we make our investigation." McLaughlin corroborated Lempinen's account of a conversation with defendant; the latter denied that he engaged in any conversation with Lempinen. While McLaughlin, who had known defendant for some time, talked with him about

the removal of the stump, Lempinen examined the piles of lumber. He then returned to the squad car and, by radio, instructed a Highland Park police officer to bring out Orsey and one Sheridan of the Hines Lumber Company. At the same time, he called the Lake County sheriff's office because Delmar Woods was outside the city limits of Highland Park. By chance, these radio messages were also received by officer Brebner of the Lake Forest police.

Orsey and Sheridan arrived shortly thereafter and began checking through the piles of lumber and building material. Approximately an hour later, officer Brebner and Anthony Hertle also arrived upon the scene. Hertle, who was building a house in Lake Forest, had complained to the Lake Forest police that certain lumber and other material had disappeared from his building site between Wednesday and Saturday morning, October 21. Upon overhearing Lempinen's call, Brebner had gone immediately to Hertle's house to pick up Hertle and had then driven to defendant's property in Delmar Woods, arriving about noon. As soon as he got out of the car, and while he was still on the sidewalk, Hertle saw a cart on the red truck, excitedly grabbed Brebner's arm, and said, "That is my cart." This identification from the sidewalk was based upon the cart's general appearance and the manner in which the handle drooped down. Then, while still on the sidewalk, Hertle described certain features peculiar to the cart: the righthand wheel was wobbly; the handle which had broken off was fastened with only one bolt instead of two; one of the hubcaps was missing, and there were two or three holes in the bottom of the cart which had been punched by the corner of a hoe during the mixing of mortar. Brebner went over to the cart and found the description to be accurate. Hertle then examined several piles of lumber and other building material on defendant's property but found nothing else belonging to him at that time.

After an hour-long search by Orsey and Sheridan, Lempinen approached defendant and stated, "I will have to take you in." Lempinen, who knew nothing about the Lake Forest theft prior to the arrival of Brebner, testified that he took defendant into custody for the theft of building material from the Highland Park building site. Defendant, protesting that all the lumber belonged to him, was then taken to the Highland Park police station.

On December 4, 1950, two separate indictments were returned, one charging defendant with the theft of building materials from Orsey having a value of $160, and the other charging the larceny of similar materials from Hertle, valued at $100. Defendant pleaded not guilty to the first indictment, was tried in the circuit court of Lake County in October, 1951, and acquitted. The trial upon the second indictment on December 10, 1951, resulted in the judgment now before us.

Other pertinent testimony should be noted. Hertle testified that, accompanied by his wife, two sons and Brebner, he returned to defendant's building site the following Monday, at which time, after further search, he identified some lumber and bags of cement as belonging to him. He identified the lumber by the fact that it was Hines Lumber Company's No. 1 type and, more particularly, that it had creosote markings on the ends, a distinguishing mark placed upon some of his lumber by his sons in order to segregate various pieces for particular parts of his house. Both Hertle and Brebner explained their failure to find the marked lumber during the search on Sunday by the fact that it was buried within a large pile. Hertle identified the bags of cement by the brand name. Two other articles which were listed as missing from his building site—a ladder and an electric light fixture—were not found. Barth, a cement contractor, and two of his employees, Reasland and French, testified that on Friday, October 20, they were

at the Delmar Woods site and observed defendant unloading 2 x 4's and other lumber from a truck. While it is difficult to determine from the record just where the lumber was placed, Barth and French apparently stated that it was put on one of the group of piles from which Hertle later identified some 2 x 4's as being his, while Reasland testified that it was unloaded behind the foundation and away from the piles. All agree that defendant, at that time, offered to trade Barth lumber in exchange for man hours of work. Finally, Edward Horneberger, defendant's brother-in-law, testified that he loaned his truck to defendant on Saturday evening, October 21, and again on Sunday morning.

Defendant's wife testified that on Friday morning, October 20, the defendant took old lumber which had been lying around the cleaning shop to the building site; that upon his return about noon, he worked until about midnight at the shop, and that on Saturday, he made deliveries from 8:30 A.M. to 3:30 P.M. when he again returned to the shop because of the breakdown of his delivery truck. She further stated that after then borrowing her brother's truck to finish the week-end work and transport more of the lumber, he returned to the cleaning shop about seven o'clock and continued to work. Finally, she testified that he borrowed the truck again on Sunday morning to take out a tree stump, and that when he left home he had on the truck a green cart which had been in their possession for over three years, the handle of which, she was "pretty sure," was broken. She asserted that People's exhibit No. 3, the cart in question, "looks like the same little cart [she] used up on the lot." Edward Grundeis, defendant's brother, stated that he was positive exhibit No. 3 was the same cart he had used for some time previous to the present incident, either in helping his brother at his building site or when he borrowed the cart to work on his own driveway.

To reverse the judgment of conviction, defendant contends that the trial court erred (1) in refusing to sustain

the motion to suppress certain evidence obtained by an allegedly illegal search and seizure, (2) with respect to giving and refusing instructions, and (3) in admitting or excluding specified evidence. He further contends that the verdict of the jury was not supported by competent evidence beyond a reasonable doubt.

Defendant's first contention is bottomed upon an alleged violation of the Federal and State constitutions because no warrant was obtained to authorize the searches which took place upon his property. In the view we take, it is unnecessary to consider the State's claim that the searches were warranted as incidental to a valid arrest. For it is well settled that a search of open fields and other places not within the curtilage of a dwelling falls outside the constitutional protection against unreasonable search and seizure. Thus, in *Hester* v. *United States,* 265 U.S. 57, 59, Mr. Justice Holmes asserted, "* * * it is enough to say that, apart from the justification, the special protection accorded by the Fourth Amendment to the People under 'persons, houses, papers and effects' is not extended to the open fields. The distinction between the latter and the house is as old as the common law. 4 Bl. Com. 223, 225, 226." This ruling has been consistently followed under constitutions which, like those of Illinois and the Federal government, guarantee to the people security "in their persons, houses, papers and effects" against unreasonable search and seizure. Machen, Search and Seizure, p. 95; *Martin* v. *United States,* 155 Fed. 2d 503; *United States* v. *Rogato,* 39 Fed. 2d 171; *Cotton* v. *Commonwealth,* 200 Ky. 349, 254 S.W. 1061; *Wolf* v. *State,* 110 Tex. Crim. Rep. 124, 9 S.W. 2d 350; *Middleton* v. *State,* 40 Okla. Crim. Rep. 197, 267 Pac. 682. But cf. *Helton* v. *State,* 136 Miss. 622, 101 So. 701; *Falkner* v. *State,* 134 Miss. 253, 98 So. 691.

The only question in this case is whether the physical conditions take the land here involved out of the "open

fields" category. If the lot had been left completely untouched, there could be no doubt that it would fall within the ruling of the *Hester case*. That a large quantity of building material has been brought upon the lot and a foundation for a house dug out, or even completely laid, does not change the nature of the place. Not even the broad policy of protection against "invasion of 'the sanctities of a man's home and the privacies of life'," which was announced by Mr. Justice Brandeis in his dissenting opinion in *Olmstead* v. *United States,* 277 U.S. 438, 473, is infringed by what took place here. Defendant's constitutional rights were not violated.

Defendant objects to instruction No. 34, concerning circumstantial evidence, given for the People. This instruction fairly states the law, and has been approved by this court. *People* v. *Calcione,* 369 Ill. 154; *People* v. *Guido,* 321 Ill. 397.

Similarly, there is no merit to defendant's contention that the trial court erred in refusing to give certain instructions requested by him. The instructions sought were adequately covered by others given. Repetition was unnecessary, and there was no error in refusing these instructions. *People* v. *Gasior,* 359 Ill. 517.

Defendant next urges that the court should have admitted People's exhibit No. 6 for identification, a photograph of Hertle's Lake Forest site allegedly taken in August, 1950, after its characterization by the State's Attorney as· "purporting to show the garden cart in his [Hertle's] possession at that time." Defendant's objection to this exhibit, based upon a lack of foundation as to when and by whom it was taken, was overruled. Later, upon its own motion, the court refused to admit the exhibit, presumably upon the grounds previously raised by defendant. Defendant, fearing that the discussion concerning the exhibit which had ensued before the jury might be prejudicial, then urged that it be admitted but the court denied this request. If there

was error at all in this ruling, it certainly was not prejudicial. The effect, if any, upon the jury of the State's Attorney's characterization is extremely problematical, particularly in view of the court's refusal to admit the exhibit and the defendant's request that it be admitted. The same considerations apply to defendant's contention that the court should have admitted People's exhibits for identification Nos. 7 through 12, consisting of invoices which Hertle received from the Hines Lumber Company. Moreover, with respect to these exhibits, defendant did not urge their admission in evidence following the court's ruling.

Officer Lempinen testified that when Brebner and Hertle arrived upon the scene they engaged in conversation. He further testified that the defendant was thirty or forty feet away and that he believed the defendant was within hearing distance of that conversation. This question was then posed, "What was that conversation?" Defendant objected on the basis of the best evidence and hearsay rules; the court overruled the objection and pointed out that the defendant's presence was the only question. Defendant's position merits little consideration. There is no prejudicial error here. The ensuing account by Lempinen bearing on Hertle's identification of the cart added nothing new to the case; that identification of the cart was completely covered by other nonobjectionable testimony. Moreover, Lempinen could testify that defendant was within hearing range. *Rost* v. *Noble & Co.* 316 Ill. 357.

Similarly, the trial court properly admitted the testimony of Barth, Reasland and French describing their conversation and observations while on the defendant's building site on Friday, October 20. While the evidence is conflicting, their over-all testimony is susceptible of the construction that defendant was unloading 2 x 4's, articles missing from Hertle's site, onto the pile from which Hertle asserts he picked out the material stolen from him. The probative value of testimony concerning defendant's offer

to trade lumber for man hours, however slight it may have been, was properly left to the jury.

Defendant's final argument is that the verdict of the jury was not supported by competent evidence beyond a reasonable doubt. The most that can be said, however, is that there was some evidence which, if believed by the jury, would support defendant's claim of innocence. In view of the clear and detailed identification of the cart and the creosote-marked lumber by the complaining witness it cannot be said that the verdict was not warranted by the evidence.

The judgment of the circuit court of Lake County is affirmed.

*Judgment affirmed.*